## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| Plaintiff, | : |
| v. | : Criminal Action No.08- $16$ |
| STEPHANO ROUSSOS, | : |
| Defendant. | : |

## **INFORMATION**

The United States Attorney for the District of Delaware charges that:

## **COUNT 1**
## **(Conspiracy to Commit Wire Fraud)**

### **Introduction**

At all times material to this Information:

1.  Escheat was a process through which a state, as sovereign, took custody of, or assumed

    title to, unclaimed property. Examples of unclaimed property included lost or forgotten

    uncashed checks, stocks, bonds, dividends, bond interest, insurance proceeds, utility

    refunds, and safe deposit box contents.

2.  The Bureau of Unclaimed Property ("Bureau") was a subdivision of the Division of

    Revenue of the Delaware Department of Finance. The Bureau received unclaimed

    property from "holders" of the property and processed claims filed by owners who sought

    to take possession of the unclaimed property.

3.  Under Delaware law, companies incorporated in Delaware were required under certain

    circumstances to file with the Bureau reports detailing their holdings of unclaimed stock

and other securities and to escheat (i.e. deliver) to the Bureau that property.

4.  When filing their reports with the Bureau, companies holding unclaimed stock were expected to comply with the requirements described in the State of Delaware Escheat Handbook. The Handbook required holders to describe the unclaimed property they would escheat with particularity. For example, holder "ABC Co." was expected to report to the Bureau that it was escheating 100 shares of its common stock worth $100, and that the books and records of the company indicated that "John Doe" of "123 Main Street, Anywhere USA" owned that property. This reporting was required to assist the Bureau in determining whether a claim filed by a purported owner of the property (for example, John Doe's heir) was legitimate.

5.  Despite this expectation, companies with unclaimed stock often described stock escheated to the Bureau as "owner unknown" because the companies did not have records that established the identity of the owner of the stock.

6.  Unclaimed property was delivered to Delaware either electronically or by check made payable to the Delaware State Escheator. The escheated property was deposited into Delaware's General Fund.

7.  There was no time limit on when a owner of unclaimed property could come forward to make a claim. In fact, most property escheated to the Bureau was never claimed.

8.  A.L. was employed by the Bureau. A.L.'s responsibilities included the processing of ownership claims to unclaimed property filed with the Bureau.

9.  A.L. had authority to approve small dollar claims. For larger claims, A.L. was required to obtain approval from one or more supervisors.

2

10. Once a claim was approved, the Bureau prepared a payment voucher and sent it to the Delaware Office of the State Treasurer ("OST"). OST was responsible for issuing checks to owners who had established their right to unclaimed property. After issuing the checks, OST delivered the checks to the Bureau for disbursement. A.L. was the person at the Bureau responsible for disbursement of checks on approved claims.

11. Company Z was a Delaware corporation created in or around January 1990 as a result of the merger of Company X and Company Y. Once it was created, Company Z attempted to contact all stockholders to advise them of the merger and the company's offer to exchange existing stock of the merged companies for the stock in the new entity. Despite several years of effort, Company Z was unable to locate the record owners of millions of dollars worth of stock and dividends. This property was escheated to Delaware in due course in or around 1997 and 1998. Much of that property was escheated as "owner unknown."

12. Following the escheatment of the Company Z's unclaimed property to Delaware, individuals continued to contact Company Z, claiming that they owned Company X and/or Company Y stock prior to the merger.

13. In response to such a claim, Company Z researched its records to determine if the claimant was entitled to property that had been escheated to Delaware. If Company Z determined its records showed that the claimant was entitled to escheated property, it sent the claimant a letter describing how much of the claimant's property was escheated to Delaware according to company records ("the Company Z Verification Letter"). Company Z also sent a copy of the Company Z Verification Letter, often by email, to the

3

Bureau. The Bureau treated the Company Z Verification Letter as adequate proof of
stock ownership.

14.    Company A was a company that escheated unclaimed property to Delaware.

15.    Company B was a company that escheated unclaimed property to Delaware.

16.    Banks were required by federal law to file a Currency Transaction Report on all cash
transactions exceeding $10,000. Persons engaged in criminal behavior often
circumvented this rule in an effort to remain anonymous by "structuring" the deposit or
withdrawal of more than $10,000 into multiple transactions, each less than $10,000.

## Charging Paragraph

17.    Beginning in or around May 2005, and continuing until in or around October 2007, in the
District of Delaware and elsewhere, STEPHANO ROUSSOS, defendant herein, and
persons known and unknown to the United States Attorney, including A.L., J.D., C.S. and
M.S., did knowingly combine, conspire, confederate and agree together and with each
other to commit an offense against the United States, to wit, to violate 18 U.S.C. § 1343,
in that they knowingly, having devised and intending to devise a scheme and artifice to
defraud, and for obtaining money and property by means of false and fraudulent
pretenses, representations and promises, would and did transmit, and cause to be
transmitted by means of wire, radio, and television communication in interstate and
foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of
executing such scheme and artifice, to wit, a facsimile sent on or about March 30, 2007,
by C.S. in or around Englishtown, New Jersey to the defendant at the Bureau of
Unclaimed Property of the State of Delaware in Wilmington, Delaware.

4

**The Scheme and Artifice to Defraud Delaware and Certain Owners of Unclaimed Property**

It was part of the scheme and artifice to defraud that:

18.     A.L. would and did process false and fraudulent claims for over $1.2 million in
unclaimed property that had been escheated to, and was in the custody of, the State of
Delaware for his own benefit and for the benefit of STEPHANO ROUSSOS, M.S., J.D.,
and C.S., as more fully set forth in paragraphs 23 to 25 below.

19.     A.L. would and did, access a computer database using a supervisor's password and falsely
record supervisory approval of a false and fraudulent claim for escheated property.

20.     STEPHANO ROUSSOS, J.D., and C.S. would and did participate in the processing of
false claims by A.L. by submitting signed and notarized claims for unclaimed property in
which they had no interest, and to which they had no right, and by submitting legitimate
identity documents to support the false and fraudulent claims, as more fully set forth in
paragraphs 26 to 30 below.

21.     A.L. would and did take checks obtained by fraud and process such checks to
STEPHANO ROUSSOS, M.S., J.D., and C.S. in the same or similar manner as he would
handle payment on legitimate claims, as more fully set forth in paragraphs 31 to 33
below.

22.     STEPHANO ROUSSOS, M.S., J.D., and C.S. would and did accept delivery of checks
obtained by fraud and deposit such checks in various bank accounts, from which accounts
they would and did withdraw and deliver A.L.'s share of the proceeds of the fraud, in a
manner designed to conceal their own participation and the participation of A.L. in the
conspiracy, as more fully set forth in paragraphs 31 to 33 below.

5

## Processing of False and Fraudulent Claims

23.    From May 2005 to October 2007, A.L. processed a series of false and fraudulent claims
for abandoned property in the names of STEPHANO ROUSSOS, M.S., J.D., and C.S.,
knowing that they were not legitimate claimants, in order to obtain the claimed property
by fraud from both Delaware and the true owner of the claimed property, in the amounts
described, and on or about the dates set forth in the table below:

| Date | Claim | Amount |
|------|-------|--------|
| May 12, 2005 | M.S. Claim | $24,014.07 |
| November 1, 2005 | First J.D. Claim | $30,033.64 |
| June 9, 2006 | First S.R. Claim | $42,101.00 |
| July 25, 2006 | Second S.R. Claim | $72,126.81 |
| September 27, 2006 | Third S.R. Claim | $182,151.23 |
| February 21, 2007 | Fourth S.R. Claim | $282,163.20 |
| March 28, 2007 | First C.S. Claim | $195,282.12 |
| June 4, 2007 | Second C.S. Claim | $222,124.23 |
| July 25, 2007 | Second J.D. Claim | $195,251.23 |

24.    Knowing that each of the claims identified in paragraph 23 above was false and
fraudulent, A.L. would and did prepare the claim for supervisory review and approval,
prepare, or cause to be prepared, a payment voucher for the claim, and submit, or cause to
be submitted, a payment voucher to OST.

25.    On or about October 9, 2007, A.L. initiated, but did not complete, processing a false and
fraudulent claim in the name of STEPHANO ROUSSOS (the "Fifth S.R. Claim")
indicating that STEPHANO ROUSSOS was entitled to $351,370.59 in unclaimed

6

property escheated to Delaware by Company A.

## Provision of Documents Supporting the Claims

26. A.L. knew that in the normal course Company Z would send Delaware a copy of the Company Z Verification Letter.

27. A.L. knew that the Bureau would consider the Company Z Verification Letter as sufficient proof of a stockholder's ownership of property escheated by Company Z in cases where the property had originally been delivered to Delaware by Company Z as "owner unknown."

28. Except for the M.S. Claim, for each of the false and fraudulent claims described in paragraph 23 above, A.L. created a forged, false, and fraudulent document purporting to be a Company Z Verification Letter, stating that the putative claimant had owned the common stock of Company Y prior to the merger that created Company Z.

29. A.L. knew that the Bureau required claimants to submit documents to establish the identity of the claimant as part of the claim approval process.

30. Except for the M.S. Claim, each of the false and fraudulent claims described in paragraph 23 above was processed with legitimate identification documents of the co-conspirator claimant, including driver's licences, social security cards, bank statements and tax returns.

## Disbursement, Division and Concealment of the Proceeds of the Fraud

31. In the case of each fraudulently-obtained check, the check was issued in the name of the co-conspirator in whose name the claim was processed, and delivered by A.L., directly or indirectly, to the claimant co-conspirator.

7

32. In each case, the claimant co-conspirator would and did deposit the fraudulently-obtained check in a bank account belonging to, or affiliated with, the co-conspirator.

33. With respect to each fraudulently-obtained check, A.L. expected to receive, and did receive, about one third to one half of the proceeds, depending on the number of other claimant co-conspirators directly participating in the transaction. Much of the time, A.L.'s share of the fraudulently-obtained property was delivered to him in a manner that was difficult to trace, typically by making structured cash withdrawals from a claimant co-conspirator's bank account, and delivering that cash to A.L. for deposit into his account, or by purchasing goods and services on his behalf.

## Overt Acts

34. In furtherance of the charged conspiracy and to effect the illegal object thereof, STEPHANO ROUSSOS, and others known to the United States Attorney did commit and perform in the District of Delaware and elsewhere the following overt acts:

   a. In or around May, 2005, A.L. processed the M.S. Claim indicating that M.S. was entitled to $24,014.07 in property escheated to Delaware by Company B.

   b. On or about May 17, 2005, M.S. deposited into his Citizens Bank account a check for $14,203.81 and a check for $9,810.26, each check being drawn on the State of Delaware Vendor Payment Account.

   c. On or about the dates listed below, M.S. made the cash withdrawals, and A.L. made the cash deposits listed below:

8

| M.S. Citizens Bank Transaction | | | A.L. Artisans Bank Transaction | | |
|---|---|---|---|---|---|
| Overt Act | Date | Transaction | Overt Act | Date | Transaction |
| c-1 | 5/19/05 | $6,000.00 Check to M.S. | c-2 | 5/20/05 | $5,800 .00 Cash Deposit |
| c-3 | 5/25/05 | $3,000.00 Check to M.S. | c-4 | 5/26/05 | $3,000.00 Cash Deposit |

d. In or around October 2005, A.L. processed the First J.D. Claim indicating that J.D., as beneficiary of "M.D.," was entitled to $30,033.64 in unclaimed property escheated to Delaware by Company Z.

e. On or about November 3, 2005, J.D. deposited a check for $30,033.64 drawn on the State of Delaware Vendor Payment Account into a Commerce Bank account.

f. On or about November 4, 2005, A.L. deposited a check for $15,000 drawn on J.D.s' Commerce Bank account into A.L.'s Artisans Bank account.

g. On or about June 9, 2006, A.L. processed the First S.R. Claim indicating that STEPHANO ROUSSOS was entitled to $42,101.00 in unclaimed property escheated to Delaware by Company Z.

h. On or about June 19, 2006, STEPHANO ROUSSOS deposited a check for $42,101.00 drawn on the State of Delaware Vendor Payment Account into a Commerce Bank account.

i. On or about the dates listed below, STEPHANO ROUSSOS wrote the following checks to cash:

| Withdrawals from Roussos' Personal Commerce Bank Checking Account, June–July '06 | | | |
|---|---|---|---|
| Overt Act | Date Presented | Amount | Memo |
| I-1 | 6/23/06 | $2,000.00 | "Draw [A.L.]" |
| I-2 | 6/29/06 | $2,000.00 | "[A.L.]" |

9

| Withdrawals from Roussos' Personal Commerce Bank Checking Account, June-July '06 | | | |
|---|---|---|---|
| I-3 | 7/3/06 | $2,000.00 | "[A.L.]" |
| I-4 | 7/17/06 | $1,000.00 | "[A.L.]" |
| I-5 | 7/31/06 | $4,000.00 | "[A.L.] cash" |

    j.    On or about July 25, 2006, A.L. processed the Second S.R. Claim indicating that

STEPHANO ROUSSOS was entitled to $72,126.81 in unclaimed property

escheated to Delaware by Company Z.

    k.    On or about August 11, 2006, STEPHANO ROUSSOS deposited a check for

$72,126.81 drawn on the State of Delaware Vendor Payment Account into a PNC

Bank account.

    l.    On or about the dates listed below, STEPHANO ROUSSOS and A.L. engaged in

the financial transactions listed below:

| Roussos Transaction | | | A.L. Transaction | | |
|---|---|---|---|---|---|
| Overt Act | Date | Transaction | Overt Act | Date | Transaction |
| I-1 | 8/14/06 | $5,000.00 Check to S.R. | I-2 | 8/15/06 | $4,000.00 Cash Deposit |
| I-3 | 8/21/06 | $5,000.00 Cash Withdrawal | I-4 | 8/21/06 | $4,000.00 Cash Deposit |
| I-5 | 8/28/06 | $9,000.00 Cash Withdrawal | I-6 | 9/7/06 | $8,900.00 Cash Down Payment on Lease for BMW 330I |

    m.    On or about September 27, 2006, A.L. processed the Third S.R. Claim indicating

that STEPHANO ROUSSOS was entitled to $182,151.23 in unclaimed property

escheated to Delaware by Company Z.

    n.    On or about October 11, 2006, STEPHANO ROUSSOS deposited a check for

$182,151.23 drawn on the State of Delaware Vendor Payment Account into a

PNC Bank account.

10

o.   On or about December 27, 2006, STEPHANO ROUSSOS wrote a check to a
furniture retailer for "[A.L.] Bedroom Set," in the amount of $4,212.

p.   On or about February 21, 2007, A.L. processed the Fourth S.R. Claim indicating
that STEPHANO ROUSSOS, as beneficiary of "N.R." was entitled to
$282,163.20 in unclaimed property escheated to Delaware by Company Z.

q.   On or about March 1, 2007, STEPHANO ROUSSOS deposited a check for
$282,163.20 drawn on the State of Delaware Vendor Payment Account into a
PNC Bank account.

r.   On or about March 30, 2007, C.S. faxed a claim form to the Bureau.

s.   On or about March 30, 2007, A.L. processed the First C.S. Claim indicating that
C.S. was entitled to $195,282.12 in unclaimed property escheated to Delaware by
Company Z.

t.   On or about April 13, 2007, C.S. deposited a check for $195,282.12 drawn on the
State of Delaware Vendor Payment Account into a Wachovia Bank account.

u.   On or about April 17, 2007, C.S. wired $65,000 from a Wachovia Bank account
to a Commerce Bank account belonging to STEPHANO ROUSSOS.

v.   On or about April 17, 2007, C.S. wired $65,000 from a Wachovia Bank account
to a PNC Bank account belonging to STEPHANO ROUSSOS.

w.   On or about the dates listed below, STEPHANO ROUSSOS and A.L. engaged in
the financial transactions listed below:

11

| | Roussos Withdrawal | | | A.L. Deposit | | | |
|---|---|---|---|---|---|---|---|
| Overt Act | Date | Amount | Bank (Branch) | Overt Act | Date | Amount | Bank |
| w-1 | 4/18/07 | $8,000 | Commerce (Kirkwood/Limestone) | --- | --- | --- | --- |
| w-2 | 4/19/07 | $8,000 | Commerce (Governor's Square) | --- | --- | --- | --- |
| w-3 | 4/23/07 | $8,000 | Commerce (Governor's Square) | --- | --- | --- | --- |
| w-4 | 4/24/07 | $8,000 | Commerce (Kirkwood/Limestone) | w-5 | 4/24/07 | $2,000 | Artisans |
| w-6 | 4/30/07 | $8,000 | Commerce (Rt 273) | --- | --- | --- | --- |
| --- | --- | --- | --- | w-7 | 5/7/07 | $25,000 | Artisans |
| w-8 | 5/10/07 | $8,000 | PNC | --- | --- | --- | --- |
| --- | --- | --- | --- | w-9 | 5/14/07 | $7,600 | Artisans |
| w-10 | 5/17/07 | $9,000 | PNC | --- | --- | --- | --- |
| w-11 | 5/22/07 | $8,000 | Commerce (Kirkwood/Limestone) | w-12 | 5/22/07 | $7,700 | Artisans |
| --- | --- | --- | --- | w-13 | 5/31/07 | $6,950 | Artisans |
| w-14 | 6/5/07 | $8,000 | PNC | --- | --- | --- | --- |
| --- | --- | --- | --- | w-15 | 6/12/07 | $6,100 | Artisans |
| w-16 | 6/14/07 | $8,000 | PNC | --- | --- | --- | --- |
| w-17 | 6/19/07 | $8,000 | PNC | --- | --- | --- | --- |
| w-18 | 6/21/07 | $8,000 | PNC | --- | --- | --- | --- |
| --- | --- | --- | --- | w-19 | 6/22/07 | $7,000 | Artisans |
| --- | --- | --- | --- | w-20 | 6/26/07 | $8,000 | Artisans |
| --- | --- | --- | --- | w-21 | 6/28/07 | $5,500 | Artisans |
| --- | Total | $97,000 | --- | --- | Total | $75,850 | --- |

x.     On or about June 4, 2007, A.L. processed the Second C.S. Claim indicating that

C.S., as the beneficiary of "R.S.," was entitled to $222,124.23 in unclaimed

property escheated to Delaware by Company Z.

y.     On or about June 26, 2007, C.S. deposited a check for $222,124.23 drawn on the

State of Delaware Vendor Payment Account into a Wachovia Bank account.

z.     On or about July 5, 2007, C.S. wired $61,001 from a Wachovia Bank account to a

Commerce Bank account belonging to STEPHANO ROUSSOS.

12

aa.     On or about July 5, 2007, C.S. wired $61,001 from a Wachovia Bank account to a PNC Bank account belonging to STEPHANO ROUSSOS.

bb.     On or about July 25, 2007, A.L. processed the Second J.D. Claim indicating that J.D. was entitled to $195,251.23 in unclaimed property escheated to Delaware by Company Z.

cc.     On or about August 20, 2007, J.D. deposited a check for $195,251.23 drawn on the State of Delaware Vendor Payment Account into a Commerce Bank account.

dd.     On or about August 28, 2007, J.D. transferred $65,000.00 to a Commerce Bank account belonging to STEPHANO ROUSSOS.

ee.     On or about August 29, 2007, J.D. wired $67,000 to a PNC Bank account belonging to STEPHANO ROUSSOS.

ff.     On or about the dates listed below, STEPHANO ROUSSOS and ANTHONY J. LOFINK engaged in the financial transactions listed below:

| Roussos Withdrawal | | | | A.L. Deposit | | | |
|---|---|---|---|---|---|---|---|
| Overt Act | Date | Amount | Bank | Overt Act | Date | Amount | Bank |
| ff-1 | 8/29/07 | $8,000 | PNC | --- | --- | --- | --- |
| ff-2 | 8/30/07 | $8,000 | PNC | | | | |
| ff-3 | 8/31/07 | $8,000 | PNC | ff-4 | 8/31/07 | $7,000 | Artisans |
| --- | --- | --- | --- | ff-5 | 9/3/07 | $8,000 | Artisans |
| ff-6 | 9/7/07 | $8,500 | PNC | --- | --- | --- | --- |
| --- | --- | --- | --- | ff-7 | 9/11/07 | $8,000 | Artisans |
| ff-8 | 9/12/07 | $8,000 | PNC | --- | --- | --- | --- |
| --- | --- | --- | --- | ff-9 | 9/18/07 | $7,900 | Artisans |
| ff-10 | 9/20/07 | $8,000 | PNC | --- | --- | --- | --- |
| --- | --- | --- | --- | ff-11 | 9/21/07 | $5,000 | Artisans |
| ff-12 | 10/4/07 | $8,000 | Commerce | --- | --- | --- | --- |

13

| Roussos Withdrawal | | | | A.L. Deposit | | | |
|---|---|---|---|---|---|---|---|
| Overt Act | Date | Amount | Bank | Overt Act | Date | Amount | Bank |
| – – – | – – – | – – – | – – – | ff-13 | 10/5/07 | $7,200 | Artisans |
| ff-14 | 10/8/07 | $8,000 | Commerce | – – – | – – – | – – – | – – – |
| – – – | – – – | – – – | – – – | ff-15 | 10/9/07 | $8,000 | Artisans |

gg.     On or about October 9, 2007, A.L. initiated processing the Fifth S.R. Claim

indicating that STEPHANO ROUSSOS was entitled to $351,370.59 in unclaimed

property escheated to Delaware by Company A.

All in violation of 18 U.S.C. §§ 1343 and 1349.

## COUNT 2
### (Money Laundering Conspiracy)

35.     Paragraphs 1 through 34 are incorporated herein by reference.

### Charging paragraph

36.     Beginning in or around June 2006 and continuing until in or around October 2007, in the

District of Delaware and elsewhere, STEPHANO ROUSSOS, defendant herein, together

and with others known and unknown to the United States Attorney, including A.L., did

unlawfully, willfully, and knowingly combine, conspire, confederate and agree among

themselves and each other to commit offenses under 18 U.S.C. § 1956, as follows:

(a) knowing that the property involved in a financial transaction represented the

proceeds of some form of unlawful activity, to conduct and attempt to conduct

such a financial transaction, to wit, the withdrawal of United States currency in

amounts under $10,000 from STEPHANO ROUSSOS' account **-****-8776 at

Commerce Bank, the activities of which bank affect interstate commerce, and

STEPHANO ROUSSOS' account **-****-5792 at PNC Bank, the activities of

14

which bank affect interstate commerce, knowing that the transaction was designed in whole or in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of specified unlawful activity, to wit, wire fraud and interstate transportation of stolen property, in violation of 18 U.S.C. § 1956(a)(1)(B)(i); and

(b) knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, to conduct and attempt to conduct such a financial transaction, to wit, the withdrawal of United States currency in amounts under $10,000 from STEPHANO ROUSSOS' account **-****-8776 at Commerce Bank, the activities of which bank affect interstate commerce, and STEPHANO ROUSSOS' account **-****-5792 at PNC Bank, the activities of which bank affect interstate commerce, to avoid a transaction reporting requirement under federal law, in violation of 18 U.S.C. § 1956(a)(1)(B)(ii).

All in violation of 18 U.S.C. § 1956(h).

## COUNT 3
### (Wire Fraud)

At all times material to this Indictment:

37.    Paragraphs 1 through 36 are incorporated herein by reference.

38.    Planet Beach Franchising Corporation ("Planet Beach") was a Louisiana-based corporation.

39.    Planet Beach marketed franchises for what it described as "contempo spas," a combination of tanning salon and day spa.

15

40.     Small Business Loan Source, LLC ("SBLS") was a Houston, Texas-based lender for

        business and commercial real estate ventures.

41.     The Small Business Administration ("SBA") was an independent agency of the federal

        government created to aid, counsel, assist and protect the interests of small business

        concerns, including through the guarantee of small business loans.

42.     SR1 Concepts, LLC was a Delaware Limited Liability Company with STEPHANO

        ROUSSOS as its sole member.

43.     TO1 Concepts, LLC was a Delaware Limited Liability Company with STEPHANO

        ROUSSOS S.R. as 50% owner and managing member and ANTHONY J. LOFINK as

        50% owner and non-managing.

## Charging Paragraph

44.     On or about March 22, 2007, in the District of Delaware, and elsewhere, STEPHANO

        ROUSSOS, defendant herein, having devised and having intended to devise a scheme and

        artifice to defraud, as more fully set forth in paragraphs 45 and 46 of this Information,

        incorporated herein by reference, did transmit and cause to be transmitted by means of a

        wire communication in interstate commerce writings, signs, and signals for the purpose of

        executing such scheme and artifice, to wit, the wire transfer of $57,159.00 from PNC

        Bank in Delaware to the Capital One Bank account of Planet Beach in Louisiana, in

        violation of 18 U.S.C. §§ 1343 and 2.

## The Scheme and Artifice to Defraud SBLS and the SBA

It was part of the scheme and artifice to defraud that:

45.     STEPHANO ROUSSOS, in an effort to obtain a small business loan from SBLS to open

16

a Planet Beach franchise, would and did submit a personal financial statement to SBLS indicating that the large amount of cash he had available to him came from an inheritance and stock sales.

46.   A.L. and STEPHANO ROUSSOS, in order to lull SBLS into believing that the large amount of cash STEPHANO ROUSSOS had on hand came from a legitimate source, would and did create a letter signed by A.L. in his official capacity and designed to create the false and fraudulent impression that the State of Delaware had honored two legitimate claims by STEPHANO ROUSSOS in 2006 for unclaimed property totaling more than $350,000, which letter was provided to SBLS.

## The Investment by STEPHANO ROUSSOS in a Planet Beach Contempo Spa Franchise

47.   Beginning in the spring of 2007, STEPHANO ROUSSOS began negotiations with Planet Beach to open a franchise (the "Franchise") in Delaware.

48.   STEPHANO ROUSSOS planned to operate the Franchise in Delaware and offer tanning and spa services, and sell related products.

49.   The Franchise business plan developed by STEPHANO ROUSSOS estimated start-up costs to be $250,400.

50.   The Franchise business plan anticipated that the majority of start-up costs would be financed by a conventional loan, or an SBA loan.

51.   On or about March 20, 2007, STEPHANO ROUSSOS formed SR1 Concepts, LLC as the entity that would operate the Franchise.

52.   On or about March 20, 2007, STEPHANO ROUSSOS formed TO1 Concepts, LLC as the entity that would develop STEPHANO ROUSSOS' rights to act as an area representative

17

for Planet Beach. STEPHANO ROUSSOS and A.L. each had a 50% interest in TO1
Concepts, LLC.

53.     The Limited Liability Company Agreement of TO1 Concepts, LLC required A.L. to make
        a $52,195.00 capital contribution to TO1 Concepts, LLC.

54.     On or about March 22, 2007, STEPHANO ROUSSOS entered into a Single Unit
        Franchise Agreement (the "Franchise Agreement") with Planet Beach. Among other
        things, the Franchise Agreement required STEPHANO ROUSSOS to pay a franchise fee
        of $12,500.

55.     On or about March 22, 2007, STEPHANO ROUSSOS paid $12,500 in franchise fees to
        Planet Beach via a $7,500 check and the $5,000 wire transfer described further in
        paragraph 58.

56.     On or about March 22, 2007, STEPHANO ROUSSOS also entered into an Area
        Representative Agreement with Planet Beach. The Area Representative Agreement
        granted STEPHANO ROUSSOS development rights for additional Planet Beach
        franchises within New Castle County Delaware.

57.     In consideration for these rights, the Area Representative Agreement required
        STEPHANO ROUSSOS to pay Planet Beach $52,159.00.

58.     On or about March 22, 2007, STEPHANO ROUSSOS wired $57,159.00 from PNC Bank
        to Planet Beach's bank. This sum included the $5,000 balance owed on the franchise fee.
        The balance of $52,159.00 satisfied STEPHANO ROUSSOS' obligation to Planet Beach
        under the Area Representative Agreement, and was contributed by A.L. in satisfaction of
        his obligation to make a capital contribution under the TO1 Concepts, LLC Limited

18

Liability Company Agreement.

59.    Beginning in or around May 2007, STEPHANO ROUSSOS contacted SBLS about

securing financing for the Franchise.

60.    Because the loan would be guaranteed by SBA, as part of its lending process, SBLS

required STEPHANO ROUSSOS to prepare an SBA personal financial statement (SBA

Form 413) ("PFS").

61.    The PFS submitted by STEPHANO ROUSSOS falsely and fraudulently indicated that in

2006 he had received $72,000 from an "inheritance." The PFS also falsely and

fraudulently indicated that in 2007 he had received an additional $285,000 from an

"inheritance."

62.    An internal SBLS document described the data from the PFS as follows: "[t]he PFS dated

5/31/07 reflects Stephano's assets. His large cash amount is from an inheritance from his

father and also he recently sold his home."

63.    In a May 31, 2007, memorandum sent to SBLS, STEPHANO ROUSSOS stated:

> I have decided to take some time off to pursue an opportunity as planet
> beach area representative for the Delaware market as well as a franchisee
> in Delaware. As my resume shows I have been in the restaurant business
> for many years, I also worked for [a company] as a business sales
> executive from October of 2006 until January of 2007 which I have not
> updated on my current resume. In February of 2007 I liquidated all of my
> stocks, in order to pursue my current goals These stocks totaled over
> 300,000 dollars, this is the reason I have not worked since January of
> 2007. My future source of income will be from operating my planet beach
> franchise and also as the area representative for the Delaware market. [sic]

64.    On June 12, 2007, SBLS conditionally approved SR1 Concepts, LLC for an SBA-

guaranteed loan in the amount of $309,000. As a condition of making the loan, SBLS

required a $173,000 cash injection from STEPHANO ROUSSOS, which would be used primarily to purchase equipment, establish a reserve, and pay for pre-opening expenses.

65. On June 20, 2007, as a further explanation for the source of STEPHANO ROUSSOS' available capital, A.L. prepared and signed a letter on State of Delaware letterhead, which letter was provided to SBLS, stating:

> Dear Mr. Roussos:
>
> Thank you for your recent inquiry in regards to unclaimed property.
>
> The State of Delaware has issued two unclaimed property checks in your name. The first was in the amount of $72,126.81 issued on 8/10/2006, check number 5229835. And the second was in the amount of $282,163.20 issued on 3/1/2007, check number 5428781. If you have any questions or concerns regarding your claimed property refunds feel free to contact me at the number below.

66. On or about July 25, 2007, SBLS, on behalf of SR1 Concepts, LLC, submitted a loan application in the amount of $309,000.00 to the SBA.

67. SBA standard operating procedure required prospective lenders to verify the source of a cash injection where the cash injection exceeded one third of the loan amount. In compliance with this procedure, SBLS included with the application package an "SBA Loan Report" in which SBLS advised the SBA that, according to STEPHANO ROUSSOS, the source of the cash injection was an inheritance.

68. On July 27, 2007, the SBA approved the SBLS loan to SR1 Concepts, LLC.

69. Beginning August 3, 2007, SBLS began disbursing the loan proceeds to SR1 Concepts, LLC. The final disbursement was made on November 1, 2007. The total amount disbursed was $309,000.00.

70.    SBLS would not have processed the loan, and the SBA would not have guaranteed the

loan, if they had known the true source of the funds.

All in violation of 18 U.S.C. §§ 1343 and 2.

## NOTICE OF FORFEITURE

71.    Paragraphs 1 to 70 are incorporated herein by reference for the purpose of alleging

forfeitures pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

72.    Upon conviction of the offense alleged in Count 1 of this Information, STEPHANO

ROUSSOS, defendant herein, shall forfeit to the United States, pursuant to 18 U.S.C. §

981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or

is derived from proceeds traceable to the offense. The property to be forfeited includes,

but is not limited to, the following

(A) a sum of money equal to $1,191,199.82 in United States currency,

representing the amount of proceeds obtained as a result of the offense, to wit, a

violation of 18 U.S.C. § 1349;

(B) all right title and interest in the Franchise, as defined above, including the

license to operate the Franchise, and the assets thereof; and

(C) all right title and interest in the license to serve as an area representative for

Planet Beach, as conveyed under the Area Representative Agreement described

above.

73.    If any of the property described above, as a result of any act or omission of the defendant:

a.    cannot be located upon the exercise of due diligence;

b.    has been transferred or sold to, or deposited with, a third party;

21

c.    has been placed beyond the jurisdiction of the court;

d.    has been substantially diminished in value; or

e.    has been commingled with other property which cannot be divided without

difficulty,

the United States shall be entitled to forfeiture of substitute property pursuant to 21 U.S.C.

§ 853(p), as incorporated by 28 U.S.C. § 2461(c).

All pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).


COLM F. CONNOLLY
United States Attorney

By: _____

David C. Weiss
Douglas E. McCann
Assistant United States Attorneys

Dated: February 5, 2008

22